IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-00266-MSK-NRN

PAULA A. ORANSKY,

    Plaintiff,

v.

MARTIN MARIETTA MATERIALS, INC.,

    Defendant.

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to cross-motions for summary judgment by both sides **(# 43, 44)**, and their associated responses **(# 48, 50)**, and replies **(# 51, 52)**.[1]

## FACTS

The pertinent facts are largely undisputed and the Court summarizes them here, elaborating as necessary in its analysis.

Ms. Oransky was hired by Martin Marietta Materials, Inc. ("MMM") in September 2014 to work as a Sales Manager in its Aggregate Division. As part of her job duties, Ms. Oransky supervised sales employees who sold MMM products and managed customer relationships. Among MMM's customers in the Aggregate Division is Anadarko Petroleum ("Anadarko"), a

---

[1] Also pending is the Defendant's Motions to Strike **(# 49, 52)** certain evidentiary material submitted by Ms. Oransky in support of her summary judgment motion. Because the challenged material plays no role in the Court's analysis herein, the Court denies the motion to strike as moot.

1

company engaged in oil and gas exploration and development. It uses MMM's aggregate products to construct well pads, access roads, and so on. Ms. Oransky's job duties called for her to have frequent contact with Anadarko officials to further sale of MMM products.

Ms, Oransky resides with her family in Erie, Colorado. On September 27, 2017, Anadarko hosted a "Community Forum" in Erie to discuss its plans for oil and gas development in the area. Ms. Oransky attended the forum, where she met and briefly chatted with an Anadarko official with whom she was acquainted through her work. During the forum, Ms. Oransky – who is concerned about health and environmental consequences associated with oil and gas development – and others protested Anadarko's activities. Ms. Oransky led protesters in a series of call-and-response chants to the effect of "We demand you [Anadarko] leave our community!" and "No drilling, no wells!," among others. The protestors succeeded in causing the forum to be cancelled early. After the protest, Ms. Oransky bragged in an online message that she "helped shut down the meeting." All of the protest activities, as well as the aftermath, were recorded on video and posted on the protestors' public Facebook page.

When it reviewed the video of Ms. Oransky's activities, MMM became concerned that such activities might harm its business relationship with Anadarko. Within a few weeks of the protest, MMM terminated Ms. Oransky's employment for having taken "actions inconsistent with her job duties and responsibilities, resulting in a conflict of interest with her role at the company."

Ms. Oransky commenced this diversity action, asserting three claims for relief against MMM, all arising under Colorado state law: (i) violation of C.R.S. § 24-34-402.5, which prohibits employers from discriminating against employees based on an "due to that employee's

2

engaging in any lawful activity off the premises of the employer during nonworking hours"; (ii) wrongful discharge in violation of public policy; and (iii) extreme and outrageous conduct.

Both Ms. Oransky and MMM move **(# 43, 44)** for summary judgment in their favor on all claims.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the

3

responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

**B. The statutory claim**

C.R.S. § 24-34-402.5(1) provides that "It shall be a discriminatory or unfair employment

practice for an employer to terminate the employment of any employee due to that employee's engaging in any lawful activity off the premises of the employer during nonworking hours." The statute provides certain exceptions, including: (i) where the off-duty activities in question "reasonably and rationally relate[ ] to the employment activities of a particular employee or particular group of employees" (as opposed to all employees of the employer), and (ii) where action by the employer "is necessary to avoid a conflict of interest with any responsibilities [the employee has] to the employer or the appearance of such a conflict of interest." C.R.S. § 24-34-402.5(1)(a), (b).

Ms. Oransky bears the initial burden to show that she is covered by the statute, that is, she must demonstrate: (i) that she engaged in a lawful activity off the premises of MMM during nonworking hours, and (ii) that she was terminated for engaging in that activity. *Miller v. Institute for Defense Analyses*, 2019 WL 9377860 (D.Colo. Feb. 26, 2019) (slip op.) The statutory exceptions are affirmative defenses, upon which MMM bears the burden of proof. *Williams v. Rock-Tenn Services, Inc.*, 370 P.3d 638, 641-42 (Colo.App. 2016).

1. Lawful activity

MMM's motion first challenges whether Ms. Oransky can show that her protest activities at the forum were "lawful." MMM argues that Ms. Oransky's disruption of the forum constituted violations of Colorado state laws – *e.g.* C.R.S. § 18-9-108 (prohibiting persons from "disrupting lawful assembly" via "physical action, verbal utterance, or any other means") – as well as provisions of the Erie, Colorado municipal code – *e.g.* Erie Mun. Code § 7-6-5(N) (prohibiting any "use or attempt to interfere with the use of any . . . space or facility within parks or recreation facilities . . . reserved for any other person or group by a permit"). Ms. Oransky responds that no citations were issued by police as a result of the protest and that no one else was

5

attempting to speak at the time when the protest occurred.

In *Coats v. Dish Network*, 350 P.3d 849, 852 (Colo. 2014), the Colorado Supreme Court considered the meaning of the term "lawful" within C.R.S. § 24-34-402.5. In *Coats*, the plaintiff engaged in the use of medical marijuana at home during off-work hours, pursuant to a state-issued license. When he failed a drug test administered by his employer and was terminated, he sued pursuant to C.R.S. § 24-34-402.5. The question considered by the Colorado Supreme Court was whether the use of medical marijuana, a practice permitted by Colorado state law but forbidden under federal law, constituted a "lawful" activity for purposes of the statute. The Supreme Court held that the term "lawful" is "not restricted in any way" and encompassed any "applicable law, including state and federal law." 350 P.3d at 851-52. Thus, the Court upheld the dismissal of the plaintiff's statutory claim on the grounds that his off-duty activities were not "lawful."

*Coats* effectively disposes of Ms. Oransky's contention that her conduct cannot be considered unlawful simply because she was not charged with a crime. In *Coats*, there was no suggestion that the employee had been charged by federal authorities with possession of marijuana; indeed, the Supreme Court noted in a footnote that federal authorities had expressly indicated an unwillingness to enforce federal laws against persons like the employee who were otherwise complying with state medical marijuana laws. 350 P.3d at 852 n. 2. Nevertheless, the Supreme Court concluded that the employee's use of marijuana was unlawful because it was nominally prohibited by law, regardless of whether the law was actually being enforced against him. By the same reasoning, the question here is not whether a police officer actually cited Ms. Oransky with a state or local criminal violation, but whether an officer <u>could have</u> done so.

In her response to MMM's motion, Ms. Oransky offers a more extended argument as to

why her conduct should be considered "lawful" or, at least, whether there is a genuine dispute of fact as to whether her conduct was lawful. Addressing MMM's invocation of C.R.S. § 18-9-108, Ms. Oransky argues that such a statute must be construed consistent with *Dempsey v. People*, 117 P.3d 800, 805 (Colo. 2005), and argues that there are, at a minimum, factual disputes as to whether her conduct would violate that statute as construed.

C.R.S. § 18-9-108 provides that "a person commits disrupting lawful assembly if, intending to prevent or disrupt any lawful meeting, procession, or gathering, he significantly obstructs or interferes with the meeting, procession, or gathering by physical action, verbal utterances, or other means." *Dempsey* interprets that statute in two significant respects. First, it indicates that, in determining whether a person *intended* to disrupt a gathering, the factfinder must consider the nature of the meeting, the "implicit customs and usages or explicit rules germane to a given meeting" – *i.e.* that outdoor events tolerate more disruption than indoor ones, and that political conventions might expect "prolonged, raucous, boisterous demonstrations" whereas funeral services would not – and the extent to which the person "was aware that his conduct was inconsistent with the customs of the assembly and whether he thereby intended his conduct to disrupt the assembly significantly." 117 P.3d at 808-09. Second, it suggests that a "significant disruption" to the event must occur. *Id.* at 809-10.

With these standards in mind, the Court finds that there is no genuine dispute of fact as to whether Ms. Oransky could have been cited for violating C.R.S. § 18-9-108. There is no dispute that the forum was a lawful meeting organized by Anadarko. It was held indoors, in a community room in the town's Community Center, and scheduled to run from 5:00 p.m. to 7:00 p.m. In publicizing the forum, Anadarko explained that its purpose was to invite community members to "meet the Anadarko employees working on these planned activities, learn more

about oil and natural gas development, and ask any questions you may have about our operations." As such, the "implicit customs" of such meetings might encompass heated exchanges between <u>individual</u> residents and Anadarko representatives on a one-to-one basis, and perhaps protests and picketing outside the venue, but it would be unreasonable to conclude that such meetings are customarily expected to tolerate groups of 30 or more individuals holding up signs and chanting loudly so as to make other discussions between interested residents and Anadarko representatives impossible.

It is also undisputed that Ms. Oransky fully understood and expected that her conduct and that of the protesters acting in concert with her would disrupt the meeting. In an e-mail sent to protesters just hours before the meeting, Ms. Oransky laid out her plans and expectations. She intended that protesters initially enter the forum shortly before 6:00 p.m. and blend in with legitimate attendees: "Everyone should be looking at the displays, asking general questions to the Anadarko reps to kill time. . . Do not protest at this time." Other protesters in an e-mail chain that included Ms. Oransky also stated that they would have to "sneak banners in" to the forum. . . Ms. Oransky's e-mail indicated that at 6:00 p.m., she should give a signal to the protesters and they would begin chanting and displaying signs. Her e-mail makes clear that Ms. Oransky understood and expected that these actions would be disruptive enough that the protesters would be ejected from the forum: "Likely, . . . we will be asked to leave, which we will do." These facts underscore that Ms. Oranksy knew that her actions and those of the group she was leading would be unwelcome at the forum and would have the effect of disrupting it.

The record is also undisputed that Ms. Oransky's conduct did indeed significantly disrupt the forum. Approximately 2½ minutes after Ms. Oransky's group began chanting – roughly at 6:02 p.m. – a representative of the Community Center announced that the facility was closing

8

and that everyone had the leave the building. Ms. Oransky took credit for that announcement immediately telling a videographer "we closed it down!" Ms. Oransky is more demure in her response brief, arguing that it is possible that the closure was not a result of her leading the chanting inside the forum room but rather a response to other protesters who were gathered in the hallway or outside the building. But the record is clear that Ms. Oransky was instrumental in the recruitment and instructing of those protesters as well. In a September 17 e-mail exchange, an individual named Theresa contacted Ms. Oransky and asked if she would like as many as 100 protesters from a Boulder-based organization to attend the September 27 forum and protest, and Ms. Oransky responded "I'd be all for that idea." Another participant in the same e-mail chain later advised Theresa that "Paula" – Ms. Oransky – "is going to organize the Anadarko meeting it terms of any noise we need to make outside, etc. We are going to entrust Paula to take on this task." In her e-mail on the day of the forum, Ms. Oransky gives specific instructions to both protesters who would be inside the forum room and "people outside" as well (whom she stated "we will use . . . as an important secondary event, almost a diversion"). In this sense, when Ms. Oransky boasted that "we closed it down," it is clear that she is referring to all of the protesters that she was directing, both inside and outside the venue. Thus, even if, as Ms. Oransky argues, the forum was cut short because of protesters in the hallway or outside the building, rather than as a result of Ms. Oransky personally leading the chanting inside the forum room, it remains undisputed that the entire protest operation was directed by Ms. Oransky and that the disruption of the forum was the result of her actions.

Under such circumstances, the Court finds that there is no genuine dispute of fact in the record and that, on the undisputed facts presented herein, Ms. Oransky's conduct on September 27 could have been deemed to constitute a violation of C.R.S. § 18-9-108, such that she cannot

9

establish that her activities were "lawful." As a result, MMM is entitled to summary judgment on her statutory claim.

### 2. Affirmative defenses

Assuming that Ms. Oransky could establish a genuine dispute as to whether her conduct on September 27 was lawful, the Court would nevertheless enter summary judgment on the statutory claim in favor of MMM as a result of its affirmative defenses as well.

#### a. Job responsibiltieis

C.R.S. § 24-34-402.5(1)(a) allows an employer to restrict an employee's off-duty activities if those restrictions are "reasonably and rationally related to the employment activities and responsibilities of a particular employee or particular group of employees, rather than to all employees of the employer." Although there is limited case authority interpreting this exception in particular, cases evaluating the statute as a whole recognize that its purpose is "to provide a shield to employees who engage in activities that are personally distasteful to their employer, but which activities are legal and <u>unrelated to an employee's job duties</u>." *Marsh v. Delta Air Lines, Inc.*, 952 F.Supp. 1458, 1463 (D.Colo. 1997).[2] In *Williams v. Rock-Tenn Services, Inc.*, 370

---

[2] *Watson v. Public Service Co. of Colorado*, 207 P.3d 860, 864-65 (Colo.App. 2008), stands to the contrary. There, an employee was terminated for having made an OSHA complaint against his employer during his off-duty hours, and he sued under C.R.S. § 24-34-402.5. In rejecting the employer's invocation of *Marsh*'s requirement that the employee's conduct must not relate to their job duties, *Watson* simply notes that the authority *Marsh* relied upon does not stand for that expansive proposition.

Because *Waston* is a decision from Colorado's intermediate courts, this Court is not bound by it. *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 622 n. 1 (10th Cir. 1995) (although such decisions <u>might</u> be persuasive of how the state's Supreme Court might rule). This Court finds *Watson*'s reasoning unpersuasive, at least in the context of C.R.S. § 24-34-402.5(1)(a). That affirmative defense explicitly provides that the employer may restrict off-duty conduct that specifically relates to an employee's particular job duties. In that circumstance, *Marsh*'s observation that protection under the statute does not flow to off-duty activities that adversely impact the employee's job duties is correct.

P.3d 638, 643 (Colo.App. 2016), the court explained that off-duty activities that would fall within this exception are those that "have an inherent connection with employment and emanate from the duties of the job"; by contrast, off-duty activities that "are not in direct conflict with the essential business-related interests of the employer" could not be restricted. The court also explained that, under the terms of the exception, "such activities and responsibilities must be unique to or within the exclusive province of the particular employee or group of employees," as the exception allowed "employers to require certain high profile members of their staff from foregoing involvement in activities that would call into question their competence." *Id.*

Here, Ms. Oransky's status as Sales Manager in the Aggregate Division is a job title that entails unique job duties and responsibilities. Ms. Oransky job responsibilities included "managing key accounts and contracts" and "oversee[ing] the development of customer relationships" with customers of the Aggregate Division, including Anadarko. With regard to Anadarko, Ms. Oransky had been personally involved in offering Anadarko officials tickets to watch Denver Broncos games in MMM's stadium box as a thank you for their business, taking Anadarko officials to at least one lunch meeting, meeting with Anadarko officials to address sales issues hear concerns, interceding with other MMM units to resolve problems that Anadarko was having, leading Anadarko representatives on a tour of MMM's facilities, and attending oil and gas industry events as a representative of MMM. The record reflects that, in a practical sense, Ms. Oransky (and her sales staff) were the "face" of MMM for purposes of interacting with customers like Anadarko.

In that respect, Ms. Oransky's close working relationship with Anadarko distinguishes her job duties from other employees in the Aggregate Division. If, for example, Ms. Oransky was instead a heavy equipment operator at MMM's quarry, and her job duties simply entailed

11

loading aggregate into MMM's trucks, her leading protest activities against Anadarko would present much less of a concern to MMM, both because Anadarko officials at the forum would be less likely to recognize a person they had never interacted with as an MMM employee and because an equipment operator's status and role within the Aggregate Division would be far enough removed from Anadarko's operations that it would be relatively unlikely to jeopardize Anadarko's willingness to continue as a customer of MMM. The same would be true if Mr. Oransky was an anonymous accountant in the Aggregate Division or a high-ranking official in a different division of MMM (*e.g.* an Aerospace Division) that did no business with Anadarko. But as a Sales Manager, the fundamental purpose of Ms. Oransky's job involved maintaining and improving relations between Anadarko and MMM, so as to increase the likelihood that Anadarko would continue to purchase aggregate from MMM and not another supplier. As is evident from Ms. Oransky's job duties extending to attending football games and oil industry presentations, ensuring good ongoing relations with large customers like Anadarko is indisputably an important job responsibility that extends beyond simply providing quality aggregate products, a function that is unique to her status as being a high-ranking employee in a sales capacity.

Thus, the only remaining question is whether a prohibition by MMM that Ms. Oransky not protest and alienate MMM's aggregate customers is "reasonably and rationally related" to her unique job responsibilities in the sales department. The Court finds that no reasonable factfinder could conclude otherwise on the particular facts of this case. Having a company's primary point of contact with a customer leading a raucous protest against the customer, "demand[ing]" that the customer "leave our community" can (and should) be expected to have negative repercussions on the customer's willingness to continue to do business with the company. As one might have expected, Ms. Oransky's prominent role in leading the protesters

12

at the forum caused immediate and adverse reactions within Anadarko, and the record reflects internal e-mails among Anadarko officials commenting that Ms. Oransky's behavior warranted Anadarko "looking for a change in vendor for rock" and that "we are taking our business elsewhere."[3]  Internal exchanges between these officials make clear that, after learning of the events at the forum, some felt personally betrayed by Ms. Oransky's prior actions attempting to be helpful and friendly towards Anadarko: one referred to her as "two-faced" and others stated that they "fe[lt] dirty having gone on [a] mine tour" of MMM's facilities that Ms. Oransky had led for Anadarko representatives.  This evidence makes clear that MMM's belief that Ms. Oransky's behavior could harm MMM's relationship with Anadarko was reasonable and rationally-related to Ms. Oransky's duty to maintain <u>good</u> relations with Anadarko.

In her response brief, Ms. Oransky first argues that, because MMM justified her termination as resulting from a "conflict of interest," that MMM may not now invoke the "job duties" exception of C.R.S. § 24-34-402.5(1)(a).  This argument misstates the record.  Although Ms. Oransky is correct that certain officials only used the phrase "conflict of interest" when referring to her termination, MMM's own termination form states that "Employee took actions <u>inconsistent with job duties and responsibilities</u> creating a conflict of interest . . . ." (Emphasis added.)  Moreover, the Court is not necessarily persuaded that the distinctions between the "job duties" and "conflict of interest" exceptions to the statute are so sharp and distinct that one could assume that reference by the employer to one necessarily precludes reliance on the other.

---

[3] Ms. Oransky argues that these Anadarko e-mails had not been disclosed to MMM at the time it decided to terminate her and thus, should not be considered as evidence supporting MMM's decision.  But the question is not whether MMM <u>knew</u> that Anadarko was put off by Ms. Oransky's conduct, but whether it would be reasonable for MMM to <u>expect</u> that Anadarko would be.  In that regard, the Anadarko e-mails are probative that MMM's expectations were reasonable.

13

Ms. Oransky also argues that her job duties were "<u>all</u> managerial" and that even the task of developing customer relationships is simply a duty to "<u>oversee</u>" relationships that are to be developed and maintained by her subordinate sales staff. As discussed above, Ms. Oransky's argument is inconsistent with the facts in the record, which reveal that Ms. Oransky was <u>personally</u> involved with developing and maintaining MMM's relationship with Anadarko by attending football games and oil industry conferences, leading Andarko officials on tours of MMM's facilities, and meeting with and communicating directly with Anadarko officials to address and resolve problems. Ms. Oransky was far from an unseen manager, unknown to Anadarko; in fact, her significant, high-level involvement with Anadarko is exactly why MMM's decision to terminate her is consistent with the provisions and intent of C.R.S. § 24-34-402.5.

Finally, Mr. Oransky argues that construing the statute to favor MMM in these circumstances "would require . . . every MMM employee (and all other employees within Colorado) [to] refrain" from any activity that "might in any manner be critical of any of the thousands of customers or potential customers of the employer." But this ignores the statute's requirement that the affirmative defense based on job responsibilities be limited to those situations where the <u>unique</u> job responsibilities of one employee or a small group of employees implicates an employer's concerns. As discussed above, only a few of MMM's Aggregate Division employees have job duties that involve maintaining good relations with Anadarko officials, and thus, only those few find their ability to engage in off-duty protest activities curtailed by MMM's interests in having them remain effective in performing their jobs. For the vast majority of MMM's employees, and the vast majority of employees statewide, engaging in the same activities that Ms. Oransky did would not exclude them from the protection of the statute. Based on the unique job responsibilities held by Ms. Oransky, and the particularly overt

14

way she chose to conduct her off-duty activities, the statute does not protect her.[4] Thus, MMM is entitled to summary judgment on its invocation of the "job duties" affirmative defense.

### b. Conflict of interest

C.R.S. § 24-34-402.5(1)(b) provides an exception to the statute's protection where the employer's restriction "is necessary to avoid a conflict of interest with any responsibilities to the employer or the appearance of such a conflict."

In *Ruiz v. Hope for Children, Inc.*, 352 P.3d 983 (Colo.App. 2013), the court considered the contours of the conflict of interest defense in a situation where an employee of a family services advocate was terminated for embarking upon a romantic relationship with a client of her agency. In affirming the entry of judgment on behalf of the employer on the conflict of interest defense, the Colorado Court of Appeals first explained that the exception reaches more than merely <u>financial</u> conflicts. 352 P.3d at 986. The court then found sufficient evidence that, in the circumstances of that case, the employee's romantic relationship with the client presented a conflict (or the appearance of one) with the employer's interests in several respects, including the fact that "the dating relationship had the potential to damage the image and reputation of [the employer] by causing third parties to lose confidence in the reliability and professionalism of the

---

[4] The Court is not unsympathetic to the difficult position Ms. Oransky found herself in: where her private interests in protecting her family and community from Andarko conflicted directly with her job responsibilities of maintaining good relations with Anadarko. But Ms. Oransky was not without options for resolving that conflict. Among others, she could have asked MMM to relieve her of any duties relating to Anadarko, thereby freeing her to protest without harming MMM's relations. She could have chosen to make her concerns known to Anadarko is a less-confrontational way, diminishing the possibility of harm to MMM's relationship with it. She could have advised her supervisor of her concerns about Anadarko and sought to reach an agreement with MMM as to what activities would protect both sides' particular interests. Or, if she felt that her concerns about Andarko were so paramount that no other compromise would be acceptable, she could have resigned her employment with MMM before embarking on the protests, thereby avoiding the consequences of an involuntary termination.

organization, and that, in turn, could endanger the grants that fund" the employer. *Id.* at 988. The court noted evidence that the employer was heavily funded by grants and that "a policy permitting employees to date clients would negatively impact [the employer's] relationship and reputation with" grant-issuing organizations, "resulting in a loss of clients and funding." *Id.*

The same rationale supports a conclusion that Ms. Oransky's protest activities created a conflict of interest between herself and MMM. As in *Ruiz*, that conflict took the form of Ms. Oransky engaging in activities of a private and personal interest on her own time, but doing so in a way that could bring the reputation of her employer with important third parties into question. Like the grant writers in *Ruiz*, it is undisputed that Anadarko represents a significant source of revenue for MMM and thus, MMM has a legitimate interest in ensuring that its reputation with Anadarko is not sullied by the actions of its employees. And unlike *Ruiz*, where the concern of damage to reputation with third parties was apparently mostly hypothetical, there is no dispute in the evidence that Ms. Oransky's private actions had the <u>actual</u> effect of tarnishing MMM's reputation within Anadarko. Thus, *Ruiz* makes clear that, in the circumstances presented here, MMM has established its conflict of interest defense.[5]

Once again, it is necessary to emphasize that the outcome of this analysis is limited to the unique facts present here. Whether the outcome would have been different if Ms. Oransky held a different position in the Aggregate Division or if she were one of the anonymous rank-and-file protesters instead of their leader and organizer is a matter upon which the Court need not speculate.

---

[5] *Ruiz* suggests that the existence of an actual or apparent conflict is "almost entirely dependent on context" and is fact-intensive, such that the question is "uniquely within the province of the fact finder." 352 P.3d at 987. But nothing in *Ruiz* suggests that, where, as here, the pertinent facts are undisputed, the Court cannot make such a finding as a matter of law.

Accordingly, the Court finds that MMM is entitled to summary judgment on Ms. Oransky's statutory claim.

**C. Public policy claim**

Ms. Oransky's second claim is that she was wrongfully discharged in violation of public policy. As a general matter, Colorado employees serve at-will and can be terminated at any time for any reason not specifically prohibited by law. However, Colorado law permits a claim where an employer terminates an employee for engaging in conduct that advances certain public policies. To bring such a claim, Ms. Oransky must show: (i) that MMM prohibited her from performing a public duty or exercising an important job-related right or privilege; (ii) that such a prohibition would violate a specific statute or undermine a clearly-expressed public policy; and (iii) that she was terminated as a result of refusing to abide by that prohibition. *Sidlo v. Millercoors, LLC*, 718 Fed.Appx. 718, 729 (10th Cir. 2018). Not all potential sources of public policy "are of sufficient gravity to outweigh the precepts of at will employment," and courts have been instructed to "develop the common law in this area with care," to ensure that the employer's action is one that "would undermine a clearly expressed public policy relating to the employee's rights as a worker." *Crawford Rehab. Services, Inc. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997).

Here, the most obvious articulation of public policy that would attach to Ms. Oransky's actions would be the off-duty activities statute of C.R.S. § 24-34-402.5. However, for the reasons discussed above, the Court has already concluded that Ms. Oransky cannot show that MMM's termination of her contravenes the public policies set forth in that statute. In her response brief, Ms. Oransky casts about for alternative sources of public policy to invoke, settling upon two: (i) C.R.S. § 8-2-108, which prohibits employers from preventing employees

17

from "engaging or participating in politics or from becoming a candidate for public office," and (ii) general principles of free speech embodied by the First Amendment to the U.S. Constitution. The Court need not delve extensively into these arguments because it is clear that, to the extent they do reflect sufficiently important public policies, those policies would necessarily be constrained by the terms of C.R.S. § 24-34-402.5(1)(a) and (b). Put differently, to the extent Colorado has a general public policy of preventing employers from placing restrictions on employee's off-duty First Amendment activities, it is clear that C.R.S. § 24-34-402.5 reflects an equally important public policy of allowing employers to terminate employees whose off-duty conduct (under the First Amendment or not) creates a conflict of interest or interferes with the employee's performance of unique job duties. C.R.S. § 24-34-402.5(1)(a) and (b) reflect Colorado public policy as well, and thus, if Colorado is willing to subordinate Ms. Oransky's freedom to engage in off-duty activities to MMM's interests where the conditions for the affirmative defenses have been met, this Court cannot conclude that her common-law claim can survive when the Court has already found that MMM is entitled to judgment on its statutory defenses. Accordingly, MMM is entitled to judgment on Ms. Oransky's wrongful discharge claim as well.

### D. Outrageous conduct

Finally, Colorado allows for recovery in tort where a defendant has engaged in conduct towards the plaintiff that is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Coors Brewing Co. v. Floyd*, 978 P.3d 663, 666 (Colo. 1999). Ms. Oransky has failed to come forward with evidence that reaches this exacting standard. For the reasons noted above, Colorado law expressly contemplates that an employer may terminate an

employee whose off-duty conduct interferes with their job duties or creates a conflict of interest, and this Court has found, as a matter of law, that Ms. Oransky's conduct did so. Because Colorado permits MMM to terminate her employment in such circumstances, its conduct in doing so can hardly be deemed to be outrageous or intolerable. Thus, MMM is entitled to summary judgment on this claim.

## **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** MMM's Motion for Summary Judgment **(# 43)** and **DENIES** Ms. Oransky's Motion for Summary Judgment **(# 44)**. The Clerk of the Court shall enter judgment in favor of MMM on all claims in this matter and close this case. MMM's Motions to Strike **(# 49, 52)** are **DENIED AS MOOT**.

Dated this 6th day of September, 2019.

**BY THE COURT:**

_/s/ Marcia S. Krieger_

Marcia S. Krieger
Senior United States District Judge